**YOUNG REFINING CORPORATION and Bass Pecan Company, Appellants,**

v.

**PENNZOIL COMPANY and Southland Oil Company, Appellees.**

No. 01–99–01236–CV.

Court of Appeals of Texas, Houston (1st Dist.).

April 12, 2001.

David L. Burgert, Houston, for Appellant.

Paul L. Mitchell, Richard H. Page, Patrick Zummo, Harrell J. Feldt, Houston, for Appellee.

Panel consists of Chief Justice SCHNEIDER and Justices TAFT and BRISTER.

## OPINION

SCHNEIDER, Chief Justice.

This is an appeal from a summary judgment entered in favor of defendants/appellees, Pennzoil Company ("Pennzoil") and Southland Oil Company ("Southland") on claims filed by plaintiff/appellants, Young Refining Corporation ("Young Refining") and Bass Pecan Company ("Bass Pecan"), which stemmed from the alleged breach of a long-term oil supply contract. The case before us involves issues of: (1) choice of law; (2) appellants' third party beneficiary status to the purported contract; (3) the definition of a farmout agreement; and (4) Mississippi antitrust law. We affirm.

### Background

#### A. Facts

The following facts are undisputed. The "Baxterville" oil field in Mississippi is one of the oldest producing oil fields in the United States. Bass Pecan is one of the lessors of the Baxterville field, and Pennzoil, which holds the Bass Pecan leases, is one of the largest producers of the field. Young Refining, a majority owner of Bass Pecan, owns an oil refinery in Douglasville, Georgia.

Before 1995, Young Refining had been purchasing crude oil produced by Pennzoil from the Baxterville field. Young Refining purchased about 80% of the production from the field, and Southland purchased the remaining 20%. Young Refining would then refine the crude oil it purchased to make asphalt, which it sold to Owens Corning Corporation ("Owens Corning"), a manufacturer of asphalt shingles. The previous oil supply agreement between Young Refining and Pennzoil was due to expire in December 1995, so the parties began discussing a new agreement.

Pennzoil was concerned about declining production in the Baxterville field and asked Young Refining to make a cash investment in redeveloping the field. Young Refining was either unable or unwilling to make such a capital investment. However, Young Refining's customer, Owens Corning, was suggested as a potential cash source.

Keener Hudson, a Young Refining employee, was the designated negotiator for Owens Corning, and Paul Bruce was the designated negotiator for Pennzoil. Hudson and Bruce prepared several draft agreements, which essentially provided that Owens Corning would make a 2 million dollar investment in reworking the Baxterville field, and Pennzoil, in return, would pay Owens Corning 70% of the net profits of the reworked wells. Owens Corning was also given the option of taking its payments "in kind."

Although Young Refining was instrumental in negotiations between Owens Corning and Pennzoil, it was not a signatory to the purported agreement, and, in fact, was not even mentioned in the draft documents. The draft documents were never signed by either Owens Corning or Pennzoil. Instead, Pennzoil found another purchaser, Southland, that was willing to provide financial assistance in reworking the Baxterville field under terms similar to those in the purported agreement between Owens Corning and Pennzoil.

Although the above-referenced facts are undisputed, the parties heatedly disagree about whether: (1) Pennzoil orally represented to Young Refining that it would not negotiate with anyone else during negotiations with Owens Corning, and (2) Pennzoil and Young Refining, acting on Owens Corning's behalf, ever reached an agreement on all essential terms of the purported contract.

## B. Procedural History

Young Refining sued Pennzoil, alleging that: (1) Pennzoil breached a contractual agreement to negotiate exclusively with Young Refining; (2) Pennzoil breached the contractual agreement reached between Hudson and Bruce; (3) the doctrine of promissory estoppel prevents Pennzoil from denying the existence of a contract; and (4) Pennzoil made negligent misrepresentations regarding its promise to deal exclusively with Young Refining and to enter into the agreement purportedly reached by Hudson and Bruce. Bass Pecan sued Pennzoil, claiming that the agreement between Pennzoil and Southland breached a right of first refusal on "farmouts," granted to Bass Pecan in its lease with Pennzoil. Both Young Refining and Bass Pecan also sued Southland, alleging that Southland tortiously interfered with the alleged agreement between Young Refining and Pennzoil.[1] Finally, Young Refining and Bass Pecan sued both defendants, alleging that the agreement eventually entered into between Pennzoil and Southland violated Mississippi antitrust law.

On May 18, 1999, the trial court denied Pennzoil's motion for summary judgment on Young Refining's claim for breach of an alleged agreement to negotiate with Young Refining exclusively and granted Pennzoil's motion for summary judgment on all issues other than its antitrust claim. On May 29, 1999, the trial Court granted Southland's motion for summary judgment on Young Refining's claims of tortious interference. On August 3, 1999, the trial court rendered summary judgment against both plaintiffs' claims under the Mississip-

---

**1.** At oral argument, plaintiffs moved to dismiss their claims against Southland. The mo-

tion was granted, and those claims will not be addressed in this opinion.

pi Antitrust Act. By separate order that same day, the trial court granted Pennzoil's motion for summary judgment against all of Bass Pecan's remaining claims. On August 16, 1999, Young nonsuited its sole remaining claim against Pennzoil (the claim for breach of the alleged oral contract to deal exclusively with Young Refining). Two days later, the trial court signed a final order of dismissal and judgment, from which Young Refining and Bass Pecan appeal.

## Issues Related to All Claims

### A. Choice of Law

In their first issue, Young Refining and Bass Pecan contend the trial court erred in applying Texas law to their claims. They argue that Mississippi law, not Texas law, governs their claims.

We find no conflict of law presented on the issues addressed in this opinion, and thus need not decide which state's laws apply. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419 (Tex.1984) (determining that, before undertaking choice of law analysis, the Court "must first determine whether there is a difference between the rules of Texas and New Mexico on this issue"); *St. Paul Surplus Lines Ins. Co. v. Geo Pipe Co.*, 25 S.W.3d 900, 903 n. 2 (Tex.App.—Houston [1st Dist.] 2000, no pet.) (stating that "[i]n the absence of a true conflict of law, we do not undertake choice of law analysis.").

We overrule issue one.

### B. Standard of Review and Burden of Proof

In issue number two, appellants contend that Pennzoil improperly shifted the burden of proof by calling its motion for summary judgment a "no evidence" motion, rather than a traditional motion.

We agree that Pennzoil's motion for summary judgment is a hybrid between a traditional motion for summary judgment, see Tex.R.Civ.P. 166a(b),(c), and a "no evidence" motion for summary judgment, see Tex.R.Civ.P. 166a. For example, several grounds asserted in Pennzoil's motion for summary judgment are affirmative defenses, such as limitations and the statute of frauds. See Tex.R.Civ.P. 94. A "no evidence" motion can be used only to defeat claims for which "an adverse party would have the burden of proof at trial." Tex.R.Civ.P. 166a(i). Because Pennzoil, not appellants, would bear the burden of proof on affirmative defenses at trial, a "no evidence" motion is inappropriate on these grounds. However, Pennzoil's motion also alleges there is no evidence of a contractual agreement between itself and Owens Corning, or that appellants are third party beneficiaries to any such contract. These allegations relate to an element of appellant's breach of contract cause of action, i.e., the existence of an enforceable contract. As such, a "no evidence" motion would be appropriate on these claims. We will discuss each ground for summary judgment and apply the correct standard of review to each ground raised in Pennzoil's motion.

A trial court must grant a motion for a conventional summary judgment if the moving party establishes that no genuine issue of material fact exists and that the MOVING PARTY IS ENTITLED to judgment as a matter of law. Tex.R.Civ.P. 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991). A trial court properly grants summary judgment in favor of a defendant if the defendant conclusively establishes all elements of an affirmative defense, or conclusively negates at least one element of the plaintiff's claim. *American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997). When reviewing a

summary judgment, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in favor of the nonmovant. *Id.; Nixon v. Mr. Property Management Co., Inc.,* 690 S.W.2d 546, 548–49 (Tex.1985).

In a "no-evidence" summary judgment, a party is entitled to summary judgment if, after adequate time for discovery, there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX.R.APP.P. 166a(i). Thus, a no-evidence summary judgment is similar to a directed verdict. *Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.,* 994 S.W.2d 830, 834 (Tex.App.—Houston [1st Dist.] 1999, no pet.). The trial court must grant the motion unless the nonmovant produces more than a scintilla of evidence raising a genuine issue of material fact on each of the challenged elements. *See* TEX.R.CIV.P. 166a(i); *Macias v. Fiesta Mart, Inc.,* 988 S.W.2d 316, 317 (Tex.App.—Houston [1st Dist.] 1999, no pet.). Under rule 166a(i), the party with the burden of proof at trial has the same burden of proof in the summary judgment proceeding. *Galveston Newspapers, Inc. v. Norris,* 981 S.W.2d 797, 799–800 (Tex.App.—Houston [1st Dist.] 1998, pet. denied). In reviewing a no-evidence summary judgment, we must indulge every reasonable inference in favor of the nonmovant and resolve any doubts in its favor. *Flameout Design,* 994 S.W.2d at 834.

### Young Refining v. Pennzoil

#### A. Breach of Contract

In its petition, Young Refining alleged that Pennzoil had breached two contracts: (1) a contract promising to negotiate exclusively with Young Refining, and (2) a long-term oil supply contract (the "net profits agreement"). Young Refining nonsuited its claim on the contract to negotiate exclusively, so we are only concerned with the net profits agreement in this opinion.

Pennzoil moved for summary judgment claiming: (1) there was no evidence that Young Refining was a party or a third-party beneficiary to the alleged contract; thus, Young Refining had no standing to sue to enforce the contract; (2) the alleged contract was barred by the statute of frauds because there was no writing signed by the parties; and (3) the alleged contract was too indefinite to be enforced.

### Did Young Refining have standing to sue to enforce the contract?

Both Young Refining and Pennzoil agree that Young Refining was not named as a party to the purported contract at issue in this case; the named parties were Pennzoil and Owens Corning. The purported contract, which was negotiated by Young Refining on Owens Corning's behalf, provided that Owens Corning would invest two million dollars in reworking certain wells in the Baxterville field in return for an interest in the net profits produced by such wells. Owens Corning could elect to take its net profits "in kind." There is no mention in the purported contract regarding Young Refining.

Young Refining alleges that it reached an agreement with Pennzoil to enter into the above-referenced agreement when Hudson and Bruce met in Houston in February 1996, finalized the deal, and shook hands. However, it is undisputed that Owens Corning never approved the deal struck by Hudson and Bruce. Michael Eubanks, majority owner of both Young Refining and Bass Pecan, admitted that Owens Corning had the final decision on whether to "pick up that deal." Owens Corning's vice president, Edward Mirra,

Jr., testified by affidavit that, at the time Pennzoil decided to enter into an agreement with Southland, Owens Corning and Pennzoil had not reached an enforceable agreement. Mirra stated, "As of that time, I had no intent to bind, and in fact did not commit to any agreement with Pennzoil regarding the Baxterville Field, particularly since no Owens Corning contract proposal had been approved by my senior management."

The record is devoid of any evidence showing that Young Refining had the authority to bind Owens Corning to the terms of the "net profits agreement" negotiated by Hudson and Bruce.

■■■■ Young Refining alleges that under Mississippi law it was a third-party beneficiary to the net profits agreement, and that, as such, it had standing to sue to enforce the agreement. We agree that, under Mississippi law, a third party beneficiary has standing to sue to enforce a contract. *Burns v. Washington Sav.*, 251 Miss. 789, 171 So.2d 322, 324 (1965). The same is also true under Texas law. *Quilter v. Wendland*, 403 S.W.2d 335, 337 (Tex. 1966). However, there must first be an enforceable agreement between the parties. The Restatement of Contracts provides:

> A promise creates no duty to a beneficiary *unless a contract is formed between the promisor and the promisee;* and if a contract is voidable or unenforceable at the time of its formation the right of any beneficiary is subject to the infirmity.

RESTATEMENT (SECOND) OF CONTRACTS § 309(1) (1981) (emphasis added).

In this case, no enforceable contract was ever reached by Owens Corning and Pennzoil because there is no evidence showing that Owens Corning was bound by the agreement negotiated by Young Refining. Put simply, Young Refining cannot be a

third party beneficiary to a nonexistent contract.

■■■■ Furthermore, there is no evidence in the record to show that Young Refining was an intended third-party beneficiary of the purported net profits agreement between Owens Corning an Pennzoil. There is a presumption against, not in favor of, third party beneficiary agreements. *MCI Telecomm. Corp. v. Texas Util. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). Absent clear indication in the contract that the parties intended to confer a direct benefit to the third party, the third party may not maintain an action as a third-party beneficiary. *Id.* The fact that a nonparty might receive an incidental benefit from a contract bestows no right of action to enforce the contract. *Id.* at 651. A third party may recover on a contract made by other parties only if the parties intended to secure some benefit to that third party, and only if the parties entered into the contract directly for the third party's benefit. *Id.* To qualify as one for whose benefit the contract was made, the third party must show that he is either a donee or creditor beneficiary of, and not one who is benefitted only incidentally by the performance of the contract. *Id.* A donee beneficiary is one who receives the promised performance as a pure donation. *Id.* A creditor beneficiary is one who receives the performance in satisfaction of a legal duty owed him by the promisee. *Id.*

In this case, the purported net profits agreement contains no indication of an intent to benefit Young Refining. Young Refining is not mentioned in the agreement, and all of the obligations flow between Owens Corning and Pennzoil. Young Refining would have benefitted, but only incidentally, by the contract. That is, if Pennzoil had agreed to supply Owens Corning with oil from the Baxterville field,

then Young Refining would have been assured that Owens Corning would continue to need its refining services. This incidental benefit is not sufficient to give Young Refining standing to sue to enforce the agreement.

Accordingly, the trial court properly rendered summary judgment on Young Refining's contract claims against Pennzoil. As a result of our holding, we need not address whether the purported agreement satisfies the statute of frauds, or whether the purported agreement was too indefinite to enforce.

## B. Promissory Estoppel

■ Young Refining also alleged in its petition that Pennzoil promised to deal exclusively with Young Refining and to enter into the net profits agreement, and that it relied to its detriment on Pennzoil's promises.

However, we have already held that Young Refining had no standing to enforce the purported agreement between Owens Corning and Pennzoil. Therefore, even if we used the doctrine of promissory estoppel to make the agreement enforceable, Young Refining's claims would still fail. It is one thing for a party to use promissory estoppel to seek enforcement of its agreement; it is be quite another for a stranger to use the doctrine to force two others to contract. Accordingly, the trial court properly rendered summary judgment on Young Refining's promissory estoppel claim against Pennzoil.

## C. Negligent Misrepresentation

■ Young Refining's petition also alleged:

Pennzoil *promised to deal exclusively with Young Refining, and also to enter into a long term supply contract [the net profits agreement] with Young Refining. These representations* were de-

signed and used to induce Young Refining into changing its position and expend significant sums of money. Pennzoil negligently and heedlessly and recklessly made material and false representations of material facts to Young Refining, which Young Refining relied upon, suffering damages as a proximate result. (Emphasis added).

Pennzoil contends that summary judgment was appropriate on these negligent misrepresentation claims because, as a matter of law, a broken promise will not give rise to a claim for negligent misrepresentation. See *Miksch v. Exxon Corp.*, 979 S.W.2d 700, 706 (Tex.App.—Houston [14th Dist.] 1998, pet. denied); *Smith v. Sneed*, 938 S.W.2d 181, 185 (Tex.App.—Austin 1997, no writ) (holding negligent misrepresentation must be of existing *fact*, not breach of future promise); *Airborne Freight Corp. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 294 (Tex.App.—El Paso 1992, writ denied) (noting that " 'false information' contemplated in a negligent misrepresentation case is a misstatement of *existing fact*.") (emphasis in original).

■ Young Refining counters that the misrepresentation of fact occurred when Pennzoil informed Young Refining that its negotiations with Southland were a "sham." This argument, however, is contrary to Young Refining's pleading, which specifically stated that Pennzoil "promised" to deal exclusively with Young Refining and to "enter into a long-term supply contract," and that "these representations" induced Young Refining into changing its position and expending significant sums of money. As such, Young Refining's negligent misrepresentation claim is nothing more than its breach of contract claim renamed as a tort. Because breach of a contractual promise will not support a negligent misrepresentation claim, the trial

court properly rendered summary judgment on this issue. In light of our disposition of this issue, we need not address whether the negligent misrepresentation claim complied with the statute of limitations and statute of frauds.

### Bass Pecan v. Pennzoil—The "Farm Out" Issue

■ Bass Pecan sued Pennzoil alleging that Pennzoil's contract with Southland violated a right of first refusal in Bass Pecan's lease with Pennzoil. The lease provision at issue provides in part:

> That in the event Lessee [Pennzoil] elects to farm-out or sub-let for the purpose of procuring the drilling of a well or wells on any of the retained lease acreage . . . said Lessee shall give notice of said election to said I.H. Bass or his designee . . . Said I.H. Bass or his said designee shall have the right to make or enter into the proposed farm-out or sublease agreement with Lessee under the same terms or conditions as contained in said notice.

Pennzoil contends that it did not violate this term because, as a matter of law, the contract with Southland was not a "farmout." Young Refining contends that there is a question of fact regarding whether the Pennzoil/Southland agreement is a farmout.

■ We agree with Pennzoil. The interpretation of an unambiguous contract is a question of law for the court. *Edwards v. Lone Star Gas Co.*, 782 S.W.2d 840, 841 (Tex.1990). There is no finding that the Pennzoil/Southland contract is ambiguous, and no party contends that it is so. Thus, we will decide, as a matter of law, whether it creates a "farmout."

■ A farmout is a common form of agreement between operators, in which a lease owner that does not want to drill

assigns the lease, or some portion of it, to another operator that does. The assignor may or may not retain an overriding royalty or production payment. *The primary characteristic of the farmout is the obligation of the assignee to drill one or more wells* on the acreage as a prerequisite to completion of the transfer. *See* 8 WILLIAMS AND MEYERS, OIL AND GAS LAW, MANUAL OF TERMS 389 (9th ed.1994) (emphasis added). The Pennzoil/Southland contract provides that *Pennzoil*, not Southland, would drill on the Bass Pecan lease. Furthermore, the Pennzoil/Southland contract specifically provides that the net profit interest obtained by Southland is "solely a non-operating interest." Only working interests have the right to drill wells. *See* 8 WILLIAMS & MEYERS 748 n. 1 ("A working interest is an operating interest under an oil and gas lease that provides its owner with the exclusive right to drill, produce, and exploit the minerals.").

The Pennzoil/Southland contract does not give Southland the right, nor does it impose on Southland a duty, to drill a well on the Bass Pecan lease. Therefore, as a matter of law, the Pennzoil/Southland contract is not a farm-out.

Accordingly, the trial court properly rendered summary judgment on this claim.

### Young Refining and Bass Pecan v. Pennzoil—Mississippi Antitrust Issues

■ Plaintiffs also sued both defendants, alleging that the contract they eventually entered into violated Mississippi antitrust law. *See* MISS.CODE ANN. § 75–21–9 (2001). Specifically, plaintiffs claim that, "[b]y entering into their contract to sell 100% of Pennzoil's Baxterville Field production to Southland, knowing that such a deal would jeopardize the existence of Young Refining, the Defendant's [sic] have entered into an illegal 'trust and combine'

under Mississippi law, for which the Plaintiffs are entitled to recover damages." Even if we were to assume that Mississippi law applied, and that plaintiffs had a claim under Mississippi antitrust law, the summary judgment was appropriate on the claims.

In support of its antitrust claim, plaintiffs introduced the affidavit of Michael Eubanks, a principal of both Young Refining and Bass Pecan, asserting that Young Refining informed both Pennzoil and Southland that, if Young Refining were denied access to Baxterville crude, it would go out of business. The issue this Court must decide is whether this affidavit raises a fact question about whether Mississippi antitrust law has been violated. If the affidavit is "no evidence" of a violation, summary judgment on these claims was appropriate.

The statute in question provides in part:

A trust or combine is ... contract ... between two or more ... corporations, when inimical to public welfare and the effect of which would be:

(a) To restrain trade;

(b) To limit, increase or reduce the price of a commodity;

(c) To limit, increase or reduce the production or output of a commodity;

(d) to hinder competition in the production, importation, manufacture, transportation, sale or purchase of a commodity.

MISS.CODE ANN. § 75–21–9.

The Mississippi Supreme Court has applied the "rule of reason" in interpreting its antitrust statute. *Jackson v. Price*, 140 Miss. 249, 105 So. 538, 539

(1925). The federal courts, in interpreting the Sherman Antitrust Act, similarly apply the rule of reason to vertical restraints [2] of trade. *Continental T.V. Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977). Only unreasonable restraints of trade are condemned by law—that restraint of trade which is injurious to the public welfare. *Jackson*, 105 So. at 539. The rule of reason condemns only those restraints that actually harm competition, as opposed to merely hurting a competitor. *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978).

In *Christofferson Dairy, Inc. v. MMM Sales*, 849 F.2d 1168 (9th Cir.1988), the plaintiff, a milk bottler, sued a milk supplier and its customer, another milk bottler, alleging that the companies had violated the Sherman Antitrust Act by entering into an output contract and refusing to sell plaintiff any milk. The court, applying the rule of reason, rendered summary judgment for the defendants on the claims because the plaintiff had not presented any evidence that the milk supplier was the sole, or even a controlling, source of milk in the region, or that the plaintiff was unable to obtain milk from other sources. *Id.* at 1172–73.

The present case is quite similar. Although Pennzoil agreed to sell its entire Baxterville production to Southland, and refused to sell to Young Refining and Bass Pecan, there is no evidence in the record that Pennzoil was the sole, or a controlling source of crude oil. Similarly, there is no evidence that plaintiffs were unable to obtain crude oil from other sources. In fact,

**2.** A vertical restraint involves agreements to restrain trade between companies at different levels of distribution, *e.g.*, manufacturers and distributors. *Carlson Mach. Tools, Inc. v. American Tool, Inc.*, 678 F.2d 1253, 1259 (5th Cir.1982). This case involves an alleged vertical restraint because Pennzoil is a petroleum producer and Southland is a petroleum purchaser.

there is undisputed proof that Young Refining did purchase crude from another supplier.

■ Under the "rule of reason," exclusive dealing contracts are not prohibited by antitrust laws unless there is a resulting foreclosure of market alternatives. *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F.Supp. 760, 766 n. 8 (S.D.Miss.1992) (citing *Elder-Beerman Stores Corp. v. Federated Dep't Stores*, 459 F.2d 138, 146 (6th Cir.1972)).

Thus, as an element of their antitrust claims in this suit, plaintiffs were required to prove that not only did the Southland/Pennzoil contract damage them, but also that competition in general was damaged by the foreclosure of other market alternatives. The affidavit of Michael Eubanks may be evidence that *plaintiffs* were damaged by the Southland/Pennzoil agreement, but it is "no evidence" that *competition* in general was damaged by the agreement.

Accordingly, the trial court properly granted summary judgment on plaintiffs' antitrust claims.

### Conclusion

We affirm the judgment of the trial court.